**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| Green Apple Grocery and Deli, LLC, et al, | |
| Plaintiffs, | |
| v. | Case No. 19-cv-1408-RDB |
| United Stated Department of Agriculture, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
THE AMENDED COMPLAINT OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Defendant, the United States Department of Agriculture ("USDA" or "Defendant"), by and through its counsel, Robert K. Hur, United States Attorney for the District of Maryland, and Jane E. Andersen, Assistant United States Attorney for said district, respectfully submits this Memorandum of Law in Support of its Motion to Dismiss or, in the Alternative, for Summary Judgment.

## I.      INTRODUCTION

Plaintiff Malek Mohamed, ("Plaintiff Mohamed" or "Owner"), the Owner of Plaintiff Green Apple Grocery and Deli, LLC ("Plaintiff Grocery" or "Store"), a convenience store located at 2526 Washington Blvd., Baltimore, Maryland 21230 (collectively, the "Plaintiffs"), bring this action pursuant to the Food and Nutrition Act of 2008, 7 U.S.C. §§ 2011 *et seq.* (the "Food and Nutrition Act"), formerly referred to as the food stamp program, and now known as the Supplemental Nutrition Assistance Program ("SNAP"). Following a 6-month investigation, the USDA's Food and Nutrition Service ("FNS" or the "Agency") uncovered 2 suspicious transaction patterns that are indicative of the illegal trafficking of SNAP benefits. FNS charged the Store with trafficking, in violation of the Food and Nutrition Act, and following a detailed administrative determination and review process, permanently disqualified the Store from participating in SNAP. In an Amended Complaint, ECF No.

7, Plaintiffs request that the Court find that they did not engage in trafficking, reverse the Agency's decision, and reinstate the Store into SNAP.

As demonstrated below, Plaintiffs are not entitled to any relief.  The evidence compiled in the Administrative Appeal Record leaves no doubt that the violations occurred based upon a series of irregular SNAP transaction patterns that occurred during the months of January 2018 through June 2018. Moreover, the sanction of disqualification is mandated by statute and regulation and thus, wholly rational and not arbitrary or capricious. Consequently, the Court should dismiss the action pursuant to FED. R. CIV. P. 12(b)(6) or, in the alternative, grant summary judgment in favor of the Defendant on all claims pursuant to FED. R. CIV. P. 56(a).

## II.     OVERVIEW OF THE SNAP BENEFIT PROGRAM

### A.     GENERAL BACKGROUND

SNAP is operated by USDA.  *See* 7 U.S.C. §§ 2011-2036.  The mission of the program is "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households."  7 U.S.C. § 2011.  In furtherance of this mission, SNAP aims to increase the food purchasing power of eligible households by supplementing the funds families have to spend on food with food stamp allotments, which may be used for purchasing food items at authorized retail food stores.  *See id.* § 2013.  SNAP benefits can only be redeemed for purchases of food; non-food purchases are not eligible for SNAP benefits.  *See id.*; *see also* 7 C.F.R. § 271.2.

The program is administered by FNS.  *See* 7 C.F.R. § 271.3.  Through FNS, a household's SNAP benefits are now delivered through electronic benefit transfer ("EBT") cards, as opposed to the paper coupons formerly used.  *See* 7 U.S.C. § 2016(j).  EBT cards operate similarly to a debit card issued by a bank.  At the beginning of each month, a SNAP beneficiary's EBT card is credited with a

dollar amount of SNAP benefits for that month.  The EBT card is then used at authorized retail food stores to purchase eligible food items.  *Id.* § 2013(a).

Retail food stores have one or more EBT terminals in their stores and, as a purchase is made, the retailer swipes the EBT card through the EBT terminal, the recipient enters a personal identification number code on a keypad, and the amount of the purchase is deducted from the beneficiary's EBT card balance.  The EBT terminal generates a receipt for each transaction and the balance remaining in the recipient's account for the month is displayed on the receipt.  The amount of the recipient's purchase is then electronically credited within two banking days to the retail food store owner's bank account.  *See id.* (providing that only retailers approved by USDA may engage in SNAP benefit transactions); 7 C.F.R. § 278.1 (describing process by which retailer becomes an approved SNAP participant).   FNS is able to monitor electronically retail food stores' EBT transactions.  *See* 7 C.F.R. § 278.6.

Pursuant to SNAP regulations, retail food store owners may not accept EBT benefits as payment for ineligible items – generally non-food items, alcoholic beverages, and some prepared hot food items.  *Id.* § 271.2 (defining the "[e]ligible foods" subject to SNAP benefits). Food store owners are also prohibited from exchanging EBT benefits for cash (one form of trafficking), regardless of whether the store discounts the benefits (for example, charging a customer $25 on his or her EBT card in exchange for $20 cash).  *Id.*

### B.   FNS'S ROLE IN COMBATING FRAUD GENERALLY; ADMINISTRATIVE PENALTIES AND REVIEW PROCESS

From the inception of the food stamp program and continuing through its evolution to SNAP, Congress repeatedly has emphasized the importance of combating fraud.  Therefore, FNS has been authorized to monitor participating stores, conduct periodic reviews of stores' EBT transactions, and

will initiate an investigation of a store when it believes an investigation is warranted by suspicious data. *Id.* at § 278.6.

FNS also is authorized to disqualify and/or assess a civil monetary penalty ("CMP") against any authorized retail food store from future participation in SNAP if the store fails to comply with any provision of the Food and Nutrition Act, or a regulation promulgated thereunder. 7 U.S.C. § 2021(a); 7 C.F.R. § 278.6. Such a disqualification must be based on "a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report under an electronic benefit transfer system, or the disqualification of a firm from the Special Supplemental Nutrition Program for Women, Infants and Children (WIC)." 7 C.F.R. § 278.6(a). The period of disqualification may range from as little as six months (for a first-time offense of exchanging ineligible non-food items for EBT benefits) to permanent, depending on the nature of the violation. FNS, in certain circumstances, has the discretion to impose a CMP in lieu of disqualification. 7 C.F.R. § 278.6(a)(1), (e)(1), (f), and (i).

When an investigation results in Agency action to disqualify a store, or assess a CMP on the owner, Title 7, C.F.R., Parts 278 and 279, provide for a system of administrative and judicial review. After receiving written notice of the action, an aggrieved retailer may request review of the administrative action by FNS. 7 U.S.C. § 2023(a); 7 C.F.R. § 279.1; *see also* 7 C.F.R. § 279.5(c) (defining scope of review for disqualification actions). If review is sought, the administrative action is held in abeyance pending disposition of the request for review, unless the penalty is a permanent disqualification for trafficking. 7 C.F.R. §§ 279.1; 279.4(a). In cases of a permanent disqualification for trafficking, the disqualification action is effective from the date the firm receives notice of the disqualification. 7 U.S.C. § 2023(a)(18). Upon completion of the review, FNS renders the "Final Agency Decision" and notifies the retailer. 7 C.F.R. § 279.5(e). This Final Agency Decision becomes

effective thirty days from the date of delivery.  *Id.* § 279.5(f).  As discussed in Part IV.A. below, judicial review is also provided by statute.

### C.   PENALTIES FOR TRAFFICKING IN SNAP BENEFITS

Trafficking is defined in 7 C.F.R. § 271.2, and generally involves the exchanging of SNAP benefits for cash or other consideration other than eligible food items.  Even for a first violation, the penalty for trafficking is permanent disqualification.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i).  FNS may impose a CMP in lieu of permanent disqualification if the store submits substantial evidence that it had established and implemented an effective compliance policy and program to prevent SNAP violations.  7 C.F.R. § 278.6(i).  The regulations establish four criteria[1] which the store must satisfy through "substantial evidence" in order for FNS to have the discretion to impose a CMP in lieu of permanent disqualification. 7 C.F.R. § 278.6(i).

## III.   STATEMENT OF FACTS

### A.   THE STORE IS ACCEPTED INTO SNAP

The Store is a convenience store located at 42526 Washington Blvd., Baltimore, Maryland 21230.  (A.R. 1).[2]  The Store is organized as a Limited Liability Company. (A.R. 5); *see also* Am. Compl. at ¶ ¶1. The Store became an authorized SNAP retailer on June 17, 2013.  (A.R. 489).

---

[1] The regulations provide additional guidance regarding how FNS should evaluate the evidence submitted with a request for a CMP.  *See* 7 C.F.R. § 278.6(i)(1).

[2] "A.R." notations refer to the numbered pages of the redacted Administrative Appeal Record. The Declaration of Shanta Swezy, Chief of the Administrative Review Branch of the Retailer Policy and Management Division of FNS, certifies that the Administrative Appeal Record (A.R. 1 to 1326) is a true and correct copy (as redacted to comply with the E-Government Act) of the record considered by the Agency in sustaining the decision to permanently disqualify the Store from SNAP.  ECF No. 20-1.

### B.   BASED ON AN UNDERCOVER INVESTIGATION, FNS CHARGES THE STORE WITH TRAFFICKING IN SNAP BENEFITS

The FNS Retailer Operations Division's ("ROD") Investigative Analysis Branch ("IAB") began an investigation into the Store because the FNS ALERT[3] System had indicated that the Store's EBT data contained patterns that were consistent with possible trafficking. (A.R. 488). As such, EBT SNAP transaction data for the months of February 2018 through June 2018 were selected an analyzed. (A.R. 99-486, 488).

A store visit occurred on June 18, 2018, to which the Owner consented and was interviewed. (A.R. 77-99, 490). The store visit revealed that the Store had one cash register and one point of sale (POS) devise. (A.R. 490). The Store had no optical scanners at the checkout, no shopping carts, and two baskets for shopping. (A.R. 490, 496-97). The Store's food stock consisted mainly of inexpensive prepacked accessory foods and canned/bottled beverages; as well as grocery items like canned and jarred goods, dried goods, and condiments. (A.R. 491-93). There were no meat bundles, seafood specials or fruit/vegetable boxes sold at the store. (A.R. 491).  There were no SNAP eligible items in the store over $5.00. (A.R. 491). The Store sells a variety of EBT ineligible items such as tobacco products, health and beauty aids, and other products, including paper goods, cleaning products and ATM or money transfer services. (A.R. 491, 497-98). The reviewer provided a layout of the public areas of the Store and took photos of interior and exterior thereof.  (A.R. 82-99, 488-499).

IAB analyzed the Store's SNAP EBT data and found suspicious transaction patterns that fell into two categories: (1) repetitive transactions in a short period of time from the same household within unusually short time frames (A.R. 500 and Attachment 1 at A.R. 519-521); and (2) excessively large purchase transactions (A.R. 505 and Attachment 2 at A.R. 522-527). With respect to the repetitive

---

[3] ALERT stands for the Anti-Fraud Locator Using Electronic Benefit Transfer (EBT) Retailer Transactions (A.R. 488) which is the system that FNS used to analyze daily EBT data for patterns which may indicate fraudulent activity.

transactions, there were 21 suspicious sets of transactions completed by 12 different households, where all of the multiple purchases from individual benefit accounts occurred within a set time period. (A.R. 500). Multiple transactions within a set time period are methods which stores use to avoid high dollar transactions that cannot be supported and are indicative of trafficking. (A.R. 500). With respect to the excessively large purchase transactions, IAB found that the largest purchase amount at the subject store during the review period was $74.50, and 312 out of the 2,235 transactions reviewed had amounts of $30.26 or more. (A.R. 503). In comparison, the average convince store transaction in Baltimore City County, MD during the same review period was $7.34. (A.R. 503). IAB found that this was very unusual and highly unlikely and indicative of trafficking, especially considering that the Store's food stock consists primarily of inexpensive convenience foods and grocery items, and all of the SNAP eligible items are priced under $5.00. (A.R. 503). Further evidence supporting trafficking was the fact that the households cited in Attachment 1 did not conduct similarly large transactions in any other store, regardless of store type. (A.R. 503-04).

IAB also compared the transaction data to the 16 other authorized stores located within a one-mile radius of Green Apple, including a supermarket. (A.R. 505). IAB also compared Green Apple to two similarly stocked stores in the area and found that Green Apple's transaction activity to be atypical in comparison. (A.R. 507-09). Green Apple had an average transaction amount that is at least $6.06 higher than the comparison stores, and $4.86 higher than the county average for a convenience store (A.R. 509-11). IAB than compared Green Apple's transaction history for the dollar amounts of $30.00-$69.00 to the county average for convenience stores, and found that Green Apple conducted significantly more transactions at each interval. (A.R. 512).

Finally, IAB found that there were 31 households that conducted a transaction of $50.00 or more at an nearby large grocery store supermarket or superstore within three days of also conducting

a transaction of $50.00 or more at Green Apple during the review period. (A.R. 513). This is unusual given that there is nothing that is sold by Green Apple that cannot be obtained at a larger store in the area, and typically for a lower price. (A.R. 513). Based upon the store visit information and analysis of transaction data during the review period, ROD determined that clear and repetitive patterns have been established of unusual, irregular, and inexplicable SNAP activity. (A.R. 515).

Michael Skaer, Section Chief of ROD, sent a letter to the Owner dated August 29, 2018 (the "Charge Letter").  (A.R. 516-518).  The Charge Letter informed the Owner that an analysis of the EBT transactions for January 2018-June 2018, established clear and repetitive patterns of unusual, irregular, and inexplicable activity for the Store's type of firm.  (A.R. 516).  It further informed the Owner that the Store was being charged with trafficking, as defined by 7 C.F.R. § 271.2 and was being considered for a permanent disqualification from the program.  *Id.*  The letter detailed the suspicious transaction of Attachment 1 and Attachment 2.  *Id.*  The suspicious transaction details were attached to the Charge Letter, broken down by suspicious patterns.  (A.R. 516-527).  The Charge Letter explained the Owner's right to reply to the charges, and to present "any information, explanation, or evidence regarding these charges" either in person or by phone to Andrew Haluptzok, an FNS employee, within ten days of the receipt of the Charge Letter.  (A.R. 517).  It also stated that the Store could request a CMP in lieu of permanent disqualification.  The Charge Letter informed the Owner that, in order to be eligible for the CMP, the Owner must present information, within ten days of the receipt of the Charge Letter, showing that the Store met the criteria established in SNAP regulations at 7 C.F.R. § 278.6(i), discussed *supra*.  (A.R. 517).  The Owner received the Charge Letter on August 31, 2018. (A.R. 528, 532).

### C.    FNS DETERMINES THAT THE STORE SHOULD BE DISQUALIFIED FROM SNAP

Plaintiffs did not response to the Charge Letter as of September 11, 2018. (A.R. 532, 1039). Therefore, FSN based its decision on all evidence available and determined that more likely that not trafficking had occurred and that permanent disqualification is the appropriate sanction. (A.R. 532). FNS issued its determination letter on September 12, 2018 ("Determination Letter"). (A.R. 533-534). The Determination Letter informed the Owner of FNS's determination that the violations alleged in the Charge Letter occurred and of the imposition of a permanent disqualification for the trafficking violations. The Determination Letter stated that the Store was ineligible for a CMP because the Owner failed to submit sufficient evidence to demonstrate that the Store had established and implemented an effective compliance program to prevent violations of SNAP. (A.R. 533). The Store was advised of the right to appeal to the Agency's Administrative Review Branch ("ARB") and notified that such appeal must be filed within ten days of receiving the Determination Letter. *Id.* The Owner was informed that the Store was not permitted to accept SNAP benefits until after a decision was rendered. *Id.* The Determination Letter was received by Plaintiffs on September 13, 2018. (A.R. 535).

### D.    THE STORE SEEKS FURTHER ADMINISTRATIVE REVIEW AND ITS PERMANENT DISQUALIFICATION IS UPHELD

In a letter dated September 11, 2018, the Owner provided a response to the Charge Letter. (A.R. 536-537). The owner also enclosed invoices of goods sold by the Store. (A.R. 536, 550-922). The letter was postmarked on September 14, 2010. (A.R. 923-24). In response to the USDA's letter, the Owner asserted that:

- The transactions flagged for trafficking took place in the ordinary course of business;

- The store sells milk products, formula, various produce, cereal and variety of frozen food products;

- The Store offers sale promotions goods; therefore, it is unusual for the Store to have sales in small amounts;

- Numerous customers purchased goods that were in sales promotions;

- The Store has consistent sales and the alleged trafficking amount is immaterial to the Store's total cost of goods sold which shows no incentive to be involved in trafficking.

(A.R. 536-37).

On September 25, 2018, Administrative Review Officer Mary Kate Karagiorgos ("ARO Karagiorgos") confirmed receipt of the Store's response and construed it as a request for an administrative review of the adverse action under SNAP. (A.R. 925). The letter also informed the Owner that he could submit any information to be considered on review, and that any such information must be postmarked by October 21, 2018. (A.R. 925). By letter dated October 20, 2018, the Owner submitted 13 statements from customers of Green Apple. (A.R. 927-940).

ARO Karagiorgos considered the Owner's response and evidence submitted. (A.R. 943). In response to the Owner's statement that the transactions in the charge letter are the result of the "ordinary course of business" and that the store sells "milk products, formula, various produce, cereal and variety of frozen food products," ARO Karagiorgos noted that the store visit on June 18, 2018, did not support this assertion. (A.R. 943-946). ARO Karagiorgos also reviewed the inventory purchase invoices and receipts in an effort to justify the stores redemptions during the reviewing period. (A.R. 947). ARO Karagiorgos also noted that the Owner failed to provide any evidence of sale promotions as claimed, and noted that an analysis of the store's redemptions during the review period rebut the Owner's assertion that it is "unusual for the store to conduct small transactions." (A.R. 947-48). The Owners' other contentions were similarly addressed and found to not be supported by the evidence. (A.R. 948). Finally, ARO Karagiorgos reviewed the 13 statements the Owner provided from SNAP recipients and compared the information with the information relied upon in the Charge letter. (A.R. 950-976). The recipients who provided statements only account for a small percentage of the flagged

transactions (13.51 percent) with the majority of the transactions being left unaccounted for. (A.R. 976).

Based upon a review off all the information, ARO Karagiorgos determined that the transactions listed in the charge letter are more likely than not the result of trafficking and that permanent disqualification is the appropriate sanction. (A.R. 976). On April 2, 2019, the Agency issued its Final Agency Decision, finding that there was sufficient evidence to support a finding that the permanent disqualification from participation in SNAP was appropriate. (A.R. 977-89). The FAD (1) summarizes the controlling statutes, regulations, charges and evidence; (2) responds to the Owner's contentions; (3) provides the Agency's analysis; and (4) concludes that the EBT transaction record provides substantial evidence that the questionable transactions during the review period have characteristics that are consistent with trafficking violations in SNAP benefits. (A.R. 978-86). The FAD notes that "[a]s there is more than one pattern of irregular transactions, the case of trafficking becomes more convincing." (A.R. 982).

First, multiple transactions were made from individual benefit accounts in unusually short time frames. (A.R. 982). This finding is supported by 21 sets of transactions, conducted by 12 different households, that totaled $2,123.39, in a 6-month period. (A.R. 982). While more than one transaction in a day by the same customer is not uncommon, it is uncommon to have multiple transactions for large dollar amounts. (A.R. 982). The transactions identified occurred through small windows and the second and subsequent transitions are too large to support a forgotten item or two. These transactions "display characteristics of use inconsistent with the nature and extent of the [Store's] stock and facilities." (A.R. 982). Based upon the photographs from the store visit, the Agency concluded that there is "no explanation as to why SNAP customers would routinely shop at [the Store] multiple times during a short period or purchase such large volume of items" given that there are "no great variety

- 11 -

of products, price advantage, profusion of large packages, or significant bulk items for sale." (A.R. 982). In sum, the Agency concluded that "[i]n the absence of any other reasonable explanation, the irregular transaction patterns are more likely than not to be a result of trafficking." (A.R. 982).

Second, excessively large purchase transactions were made from recipient accounts. (A.R. 982). This finding is supported by 312 SNAO transactions as large as $74.50 that total $14,349.55 in SNAP benefits over a 6-month period. (A.R. 982). These large transactions are not supported by the Store's inventory, which does not have fresh meat or produce. (A.R. 982). During the store visit, the Store did not have any items that are SNAP eligible for more than $5.00. (A.R. 982). Further, there is no reasons to assume that the Store would be likely to have SNAP redemption patterns that differ significantly from nearby, similar-sized competitors. (A.R. 982). Thus, the substantial number of high dollar purchases calls into question the legitimacy of these transactions.

Although the Owner contends that it seeks mile product, formula, various produce, cereal, and frozen foods, the store visit does not support this contention. (A.R. 982). Moreover, none of the invoices submitted by the Owner showed the purchase of infant formula or produce and the only frozen item found on the invoices were ice cream. (A.R. 982). There also was no evidence to support the Owner's contention that the Store has sale promotions and no such evidence was present during the store visit (A.R. 982).

When comparing the Store's SNAP transactions with two nearby similarly or better stocked convenience stores, during the review period, the Store's average SNAP transaction amount was double than the other two stores. (A.R. 983). No rational explanation for this difference could be determined. The transaction pattern of the Store also exceeded the other two authorized stores. (A.R. 983). In addition to these two nearby convince store, the Green Apple's average SNAP transactions was 40 percent greater than the average for all convenience stores in Baltimore City County. (A.R.

983). Also notable was the fact that Green Apple conducted more transactions in each ten dollar range between $30.00-$69.00 than the average convenience stores in the State of Maryland (135 vs 24.27). (A.R. 983). This finding was particularly indicative of trafficking given the Store's eligible food stock, infrastructure, and proximity to larger, better-stocked stores. (A.R. 983)("there are 16 SNAP authorized stores within a one-mile radius of [Green Apple], including 12 other convenience stores, three small groceries, and one supermarket").

Moreover, the shopping patterns of five of the households identified in the charge letter were analyzed, and all five of the households had access to, and shopped at supermarkets and super stores. (A.R. 983). Despite this access and shopping pattern, each of the five households conducted excessively large transactions at Green Apple. (A.R. 983).

The Agency considered the invoices submitted by the Owner. (A.R. 984). Based upon an assumption of a 40 percent mark-up and that 20 percent of sales were from cash or credit, the Store did have sufficient food purchases to justify its total monthly SNAP redemption. The Agency concluded, however, sufficient inventory alone does not explain the suspicious patters of SNAP transactions such as rapid and consecutive transactions by individuals during the same sort visit or in a single day. (A.R. 984). The Agency also considered the 13 customer statements from SNAP recipients. (A.R. 984). Of the 13 statements, four of the households could not be located; one household did not conduct any transactions at the Store during the review period; three household conducted transactions at the store during the review period but were not listed on the Charge Letter; and five of the household conducted 39 of the transactions listed on the Charge Letter. (A.R. 984). This information was insufficient to alter the Agency's conclusion.

The Agency also considered the Owner's contention that the amount of trafficking is immaterial to its total costs of goods sold and therefore there was no incentive to be involved in

trafficking. (A.R. 984). The Agency noted that it was not unusual for a store to have largely legitimate SNAP transactions while conducting a small number of trafficking violations with a few trusted households. (A.R. 984). Regardless, the Agency rejected the Owner's contention, noting that the dollar volume cited was more than 50 percent of the stores total dollar volume during the review period. (A.R. 984).

Finally, the finding of disqualification as found to be appropriate because the Owner did not request consideration for a trafficking CMP in lieu of a permanent disqualification under 7 C.F.R. § 278.6(i) nor was there any evidence that the Store had established and implemented an effective compliance policy to prevent SNAP violations. (A.R. 985).

In conclusion, the FAD found that based upon a review of all the evidence, it is more likely true than not true that the program violations did occur as charged and permanent disqualification was required. (A.R. 985).  The FAD included the Store's rights to judicial review thereof.  (A.R. 986). The Owner received the Final Agency Decision on April 12, 2019.  (A.R. 987).  A Complaint was timely filed with this Court on May 13, 2019. (ECF No. 1). An Amended Compliant was filed on December 6, 2019. (ECF No. 7).

## IV.     APPLICABLE LEGAL STANDARDS

### A.     SCOPE OF JUDICIAL REVIEW

After receiving notice of the final action by the Agency, an aggrieed retailer may seek *de novo* judicial review. .  7 U.S.C. § 2023(a)(13), (15); 7 C.F.R. § 279.7.  The Court is not limited to the administrative record. *Negash v. United States*, 772 F. App'x 34, 36 (4th Cir. 2019). In this context, *de novo* review "means that the retailer bears the ultimate burden of proving by a preponderance of the evidence that the alleged violations did not occur." *AJS Petroleum, Inc. v. United States*, No. 1:11-cv-

01085, 2012 WL 683538, at *4 (D. Md. Mar. 1, 2012); *see also, e.g.*, *2341 E. Fayette St., Inc. v. United States*, No. 1:05-cv-00974, 2005 WL 2373696, at *1 (D. Md. Sept. 26, 2005) (Motz, J.).

This *de novo* provision "does not, however, entitle plaintiffs to reach a trial on the merits of their cause of action." *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 598 (E.D. Va. 2000) (emphasis supplied). Congress simply "intended … [that] the district court would not be bound by the administrative record." *Id.* In attempting to disprove the violations, the retailer is not limited to the factual record before the Agency, but may rely on other evidence as well. *AJS Petroleum, Inc.*, 2012 WL 683538, at *4 (quoting *Kim v United States*, 121 F.3d, 1269, 1272 (9th Cir. 1997)) ("[T]the plaintiff may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency.").

Accordingly, "summary judgment is a proper means of disposing of a request for review under 7 U.S.C. § 2023(a)(13), where there are presented no genuine issues of material fact." *Bon Supermarket & Deli*, 87 F. Supp. 2d. at 599; *see Idias v. United States*, 359 F.3d 695, 696 (4th Cir. 2004) (affirming district court's award of summary judgment in case involving permanent disqualification for food stamp trafficking); *see also, e.g.*, *Freedman v. U.S. Dept. of Agriculture*, 926 F.2d 252, 261 (3d Cir. 1991) (holding that the statutory requirement of a trial *de novo* "is compatible with a summary judgment disposition if there are no material facts in dispute"). Additionally, "[w]hether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment." *Duchimaza v. United States*, 211 F. Supp. 3d 421, 439 (D. Conn. 2016).

## B.  MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

A motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure serves to test the legal sufficiency of the complaint. *See, e.g.*, *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's

"[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] their claims across the line from conceivable to plausible." *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). Although courts must generally accept as true the allegations of a complaint, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### C.   MOTION FOR SUMMARY JUDGMENT

A defendant's Rule 12(b)(6) motion may also be treated as one for summary judgment if the Court considers matters outside the pleadings. *See* FED. R. CIV. P. 12(d). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). As the Supreme Court has emphasized, "[b]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). On those issues on which the nonmoving party will have the burden of proof, it is the responsibility of the nonmoving party to confront the motion for summary judgment with evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.

In this case, the Administrative Record is both comprehensive and will enable a rational determination of Plaintiffs' claims through established summary judgment practice.  Recently, the Fourth Circuit upheld the granting of summary judgment in a case challenging the permanent disqualifications for SNAP trafficking based upon the administrative records.  *Negash v. United States,* 772 F. App'x 34  (4th Cir. 2019); *see also 7-Eleven, Inc. v. United States*, No. 1:15-cv-00543, 2016 WL 5107129, at *3-4 (D. Md. Jan. 29, 2016) (Russell, J.); *Mahmood*, 2012 WL 3038638, at *1 & n.4 (Nickerson, J.); *AJS Petroleum, Inc.*, 2012 WL 683538, at *5 (Legg, J.); *Bernal Deli Grocery v. United States*, MJG-10-cv-1761, ECF 13, at 6-7 (D. Md. Aug. 26, 2011) (Garbis, J.).

## V.   ARGUMENT

### A.   THE COURT SHOULD DISMISS THE COMPLAINT, PURSUANT TO RULE 12(b)(6), FOR FAILURE TO STATE A CLAIM

The Amended Compliant fails to allege any fact, which, if true, demonstrate that the Agency's finding, is not supported by substantial evidence. Instead, the Amended Complaint makes incorrect statements of law and conclusory assertions that are not entitled to the presumption of truth. Accordingly, the Court can dismiss the Amended Compliant pursuant to Rule 12(b)(6).

First, the Amended Complaint asserts that FNS's finding of trafficking was not supported by the administrative records and is otherwise arbitrary and capricious. *See* Amended Compliant at ¶ ¶ 7-11, 20. In support of this assertion, the Amended Complaint alleges that FNS failed to consider all information submitted by or related to the plaintiffs. *See* Amended Compliant at ¶ 23. A carefully reading of the FAD demonstrates otherwise. The Amended Compliant fails to assert what information was not considered. Instead, the Agency carefully analyzed the invoices and customer statements provided by the Owner. The fact that plaintiffs may disagree with the ultimate conclusion does not mean that the agency failed to consider all the evidence. Because there are no factual allegations to

support a finding that the Agency considered all the evidence, this ground must be rejected by the Court.

Second, the Amended Complaint alleges that the decision to permanent disqualify the Store "was not rationally related to any legitimate governmental interest" and "is inconsistent with Congressional intent in enacting the Food and Nutrition Act of 2008," and in violation of agency regulations, including 7 C.F.R. §278.1. *See* Amended Compliant at ¶¶ 12-14, 20-22. These allegations must be rejected as a matter of law. Contrary to plaintiffs' suggestion, Congress determined that the penalty for trafficking, even for a first-time offense, is permanent disqualification. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *see also Negash v. United States,* 772 F. App'x 34, 35 (4th Cir. 2019) ("Congress has been quite firm in ensuring that [SNAP benefits] are used only to purchase eligible food items, and are not exchanged for cash or other things of value." *citing Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004) (brackets in original). And while the Amended Complaint references 7 C.F.R. §278.1, this provision governs approval of retail food stores into the SNAP program, and not disqualifications which are governed by 7 C.F.R. § 278.6. As such, this allegation does not serve as a basis to disturb the Agency's findings.

Third, plaintiffs alleges that the FAD relied upon records and information in the FNS's possession which were never provided to the Owner. *See* Amended Compliant at 15. The Amended Complaint fails to articulate what information was not provided. Instead, the Owner was provided with a Charge Letter, informing the Owner that an analysis of the EBT transactions for January 2018-June 2018, established clear and repetitive patterns of unusual, irregular, and inexplicable activity for the Store's type of firm. (A.R. 516). The letter detailed the suspicious transaction of Attachment 1 and Attachment 2. *Id.* The suspicious transaction details were attached to the Charge Letter, and

broken down by suspicious patterns.  (A.R. 516-527). Accordingly, this claim must be rejected as without basis.

Fourth, plaintiffs allege that the "FAD was not based upon any declarations or affidavits from a USDA or FNS official, employee, or contractor whose identity was disclosed." *See* Amended Compliant at ¶ 16. Once again, this allegations is without basis. FNS is authorized to disqualify and/or assess a CPM against any authorized retail food store from future participation in SNAP if the store fails to comply with any provision of the Food and Nutrition Act, or a regulation promulgated thereunder.  7 U.S.C. § 2021(a); 7 C.F.R. § 278.6.  Such a disqualification may be based upon evidence established through, *inter alia*, on-site investigations, inconsistent redemption data, and evidence obtained through a transaction report under an electronic benefit transfer system.  7 C.F.R. § 278.6(a). There is no requirement that any declarations from the agency be submitted. As such, this claim must also fail as a matter of law.

Plaintiffs offer no other factual allegations to support an assertion that the FAD was not support by substantial evidence. Indeed, the Fourth Circuit held that there can be "little question" that it is proper for the Agency to base a disqualification determination on EBT data.  *See Idias*, 359 F.3d at 698; *see also, e.g.*, *Duchimaza*, 211 F. Supp. 3d at 432-33 ("[T]he Government may permanently disqualify a retailer on the basis of EBT data."). Accordingly, because the EBT data provides ample support for the finding of trafficking, and because plaintiff has not alleged additional evidence or explanation to alter this finding, the Agency's decision must be upheld. In sum, the Amended Complaint is precisely the kind of threadbare complaint which contains merely legal conclusions that the Fourth Circuit has held should be dismissed pursuant to *Iqbal* and *Twombly*.  *See Francis*, 588 F.3d at 193-95 (applying *Iqbal* and *Twombly*, *supra*). As such, the Court may grant defendants' motion pursuant to Rule 12(b)(6).

**B.** **ALTERNATIVELY, THE COURT SHOULD ENTER SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANT BECAUSE THE RECORD CLEARLY DEMONSTRATES TRAFFICKING OF SNAP BENEFITS AND BECAUSE THE PENALTY OF DISQUALIFICATION WAS NOT ARBITRARY AND CAPRICIOUS**

Alternatively, summary judgment is appropriate based upon the extensive Administrative Record. The EBT data provides substantial and unequivocal evidence that the Store violated the statutes and regulations governing SNAP by trafficking in SNAP benefits.  Further, as explained more fully *infra*, under the circumstances of this case, permanent disqualification was the only available sanction as a matter of law, and, as such, the Agency's decision to permanently disqualify the Store from SNAP was not arbitrary and capricious and must be upheld.

**i.** *The Agency's Determination that the Store Engaged in Trafficking Is Fully Supported by the Administrative Record*

It is well-settled that a store can be held liable for trafficking even without direct evidence thereof, *i.e.*, even if the store was not caught exchanging EBT benefits for cash "red handed."  *See AJS Petroleum, Inc.*, 2012 WL 683538, at *5 (quoting *Young Choi Inc. v. United States*, 639 F. Supp. 2d 1169, 1178 (D. Haw. 2009)) ("FNS does not need to provide evidence that a store was caught 'red-handed' engaging in a food stamp violation in the summary judgment stage."); *see also Savera Super Store, LLC v. United States*, No. 1:14-cv-00554, 2016 WL 55274, at *1 (D.N.H. Jan. 5, 2016) ("[S]ummary judgment may be appropriate based on that record evidence even in the absence of 'red handed' evidence of trafficking."); *Nadia Int'l Market v. United States*, No. 5:14-cv-82, 2015 WL 7854290, at *5 (D. Vt. Dec. 2, 2015) ("The Agency … need not catch a store 'red-handed' to support its determination of trafficking.").  Here, consistent with the statutory and regulatory scheme governing SNAP, the Agency's decision to permanently suspend the Store therefrom was based on "facts established through on-site investigations, inconsistent redemption data, [and] evidence establish through a

transaction report under an electronic benefit transfer system," and should thus be upheld.  *See* 7 U.S.C. § 2021(a)(2); *see also* 7 C.F.R. § 278.6(a).

As detailed in Part III.D above, the Agency identified two categories of suspicious transactions that are probative of trafficking: (1) multiple transactions made from individual benefit accounts in unusually short time frames; and (2) excessively large purchases made from recipient accounts. In the Final Agency Decision, the Agency explained in detail and provided substantial documentation to support its ultimate finding that the Store engaged in trafficking with respect to each of the patterns of suspicious transactions. (A.R. 977-89).

First, based upon a review of transaction data during the relevant review period, it was found that there were multiple transactions made from individual benefit account in unusually short time frames. While it is not unusual for one customer to make more than one transaction in a day, it is uncommon to have multiple transactions for large dollar amounts. (A.R. 982). This finding is supported based upon transaction data from 21 sets of transactions, conducted by 12 different households, that totaled $2,123.39, in a 6-month period. (A.R. 982).  Courts have routinely granted summary judgment upholding permanent disqualification from SNAP where the Agency relied on, *inter alia*, EBT data showing that the stores had rapid and repetitive EBT transactions.  *See, e.g., Young Choi Inc.*, 639 F. Supp. 2d at 1178 (granting summary judgment in favor of the Government where EBT data revealed "rapid and multiple transactions"); *Hanna v. United States*, No. 2:04-cv-74627, 2007 WL 1016988, at *2 (E.D. Mich. Mar. 30, 2007) (granting summary judgment in favor of the Government where EBT data revealed "a number of instances of a single food stamp recipient engaging in multiple transactions within a relatively short time period"); *Duchimaza*, 211 F. Supp. 3d at 434 (granting summary judgment in favor of the Government where EBT data showed "EBT

transactions where multiple withdrawals were made from the account of a single SNAP household within 24 hours").

Second, a review of the transaction data, along with a comparative analysis of similar stores in the area, supports the finding that excessively large purchase transactions were made from recipient accounts, which is suggestive of trafficking. (A.R. 982). This finding is supported by 312 SNAP transactions as large as $74.50 that total $14,349.55 in SNAP benefits over a 6-month period. (A.R. 982). It was found that the largest purchase amount at the subject store during the review period was $74.50, and 312 out of the 2,235 transactions reviewed had amounts of $30.26 or more. (A.R. 503). In comparison, the average convince store transaction in Baltimore City County, MD during the same review period was $7.34. (A.R. 503). This was very unusual and highly unlikely and indicative of trafficking, especially considering that the Store's food stock consists primarily of inexpensive convenience foods and grocery items, and all of the SNAP eligible items are priced under $5.00. (A.R. 503). Further evidence supporting trafficking was the fact that the households cited in Attachment 1 did not conduct similarly large transactions in any other store, regardless of store type. (A.R. 503-04). The Agency also compared the transaction data to the 16 other authorized stores located within a one-mile radius of Green Apple, including a supermarket, and this evidence supports the finding of trafficking on the part of Green Appel. (A.R. 505-09). The investigation also revealed that 31 households that conducted a transaction of $50.00 or more at an nearby large grocery store supermarket or superstore within three days of also conducting a transaction of $50.00 or more at Green Apple during the review period. (A.R. 513). This is unusual given that there is nothing that is sold by Green Apple that cannot be obtained at a larger store in the area, and typically for a lower price. (A.R. 513). Based upon the store visit information and analysis of transaction data during the

review period, ROD determined that clear and repetitive patterns have been established of unusual, irregular, and inexplicable SNAP activity. (A.R. 515).

Courts have routinely granted summary judgment upholding permanent disqualification from SNAP where the Agency relied on, *inter alia*, EBT data showing multiple instances of high-dollar transactions for the type of store. *See, e.g., Negash v. United States*, 772 F. App'x 34, 36-37 (4th Cir. 2019) ("the USDA rightfully concluded that there is no logical explanation for 72 individuals spending over $100 on convenience store items when Appellants' store does not have a single shopping cart or basket [and] households were visiting larger grocery stores in addition to Appellants' store."); *Shanaa v. United States*, No. 2:15-cv-00042, 2017 WL 2838150, at *4 (E.D. Wis. June 30, 2017) (granting summary judgment in favor of the Government where EBT found "excessive numbers of large dollar purchases," which were "inconsistent with the store's inventory which is predominately comprised of low value food items") (internal quotation marks omitted); *Duchimaza*, 211 F. Supp. 3d at 437 ("An unusual number of high-dollar transactions is likewise an indicator of trafficking based on Government analysis of stores caught in trafficking violations during on-site investigations."); *see also Cedar Food Mkt. 7, Inc. v. United States*, 2019 U.S. Dist. LEXIS 218135, at *9 n.11 (D.N.J. Dec. 19, 2019) (compiling cases).

And while the Owner submitted invoices and customer statements in an attempt to challenging the Agency's conclusion, this evidence proved insufficient to alter the Agency's determination. *See Idias v. United States*, 359 F.3d 695, 698 (4th Cir. 2004)(Agency disqualification determination upheld even where retailer was able to controvert some of the Government's evidence).

ii.     *The Agency's Decision to Permanently Disqualify the Store Is Mandated by Statute and Is thus Not Arbitrary and Capricious*

To the extent that the Amended Complaint seeks to challenge the sanction of permanent disqualification in the event that the finding of trafficking is upheld, this claim must also fail. Where

trafficking has been proven, permanent disqualification is *the* sanction Congress prescribed.  7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i); *Idias*, 359 F.3d at 697 ("[A] store that is caught trafficking in food stamps even one time *must be* permanently disqualified.") (emphasis added).  Only when FNS determines that the firm has submitted substantial evidence demonstrating that it had established and implemented an effective compliance policy and program (as well as its non-involvement in the trafficking) does FNS even have the discretion to impose a CMP in lieu of permanent disqualification. 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i). Here, the plaintiffs failed to request a CMP, let alone demonstrate a CMP in lieu of permanent disqualification would be appropriate.

In this case, the Charge Letter stated that the Store could request a CMP in lieu of permanent disqualification, but that, in order to be eligible for the CMP, Owner must present information, within ten days of the receipt of the Charge Letter, that the Store met the criteria established in SNAP regulations at 7 C.F.R. § 278.6(i).  The Owner did not request a CMP in lieu of permanent disqualification and did not submit any evidence to support such a request. 7 C.F.R. § 278.6(b)(2)(iii) provides that, "if a firm fails to request consideration for a civil money penalty in lieu of a permanent disqualification for trafficking and submit documentation and evidence of its eligibility within the 10 days specified … , the firm shall not be eligible for such a penalty."  As Plaintiffs did not request such consideration and provided no evidence, information or argument in support thereof, the Agency's decision to permanently disqualify – and not to impose a CMP – must be sustained as appropriate. *See, e.g.*, *Mahmood*, 2012 WL 3038638, at *3 ("[T]he Court agrees that the permanent disqualification of Plaintiff from participation in the SNAP program is not arbitrary or capricious and is, in fact, mandated by the statute.").

## VI.    **<u>CONCLUSION</u>**

For the reasons set forth above and those appearing in the Administrative Record, the Defendant respectfully requests that this Court grant its motion and either dismiss the Complaint or grant summary judgment in its favor as to all claims.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____/s/_____

Jane E. Andersen (Bar No: 802834))
Assistant United States Attorney
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770
(301) 344-4422
Jane.Andersen@usdoj.gov
