IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GREEN APPLE GROCERY AND DELI, C/O MALEK MOHAMED, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. RDB-19-1408 |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Malek Mohamed and Green Apple Grocery and Deli bring this action against Defendant the United States Department of Agriculture ("Defendant" or "USDA") under 7 U.S.C. §§ 2011 *et seq.*, asking the Court to set aside the Food and Nutrition Service's decision to permanently disqualify them from participating in the Supplemental Nutrition Assistance Program as a retailer. Now pending is Defendant's Motion to Dismiss the Amended Complaint or, in the Alternative, for Summary Judgment. (ECF No. 21.) The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, Defendant's Motion to Dismiss the Amended Complaint or, in the Alternative, for Summary Judgment (ECF No. 21), treated as a motion for summary judgment, shall be GRANTED, and judgment shall be entered in favor of Defendant.

1

**BACKGROUND**

Plaintiff Malek Mohamed ("Mohamed") is the owner and operator of Plaintiff Green Apple Grocery and Deli, LLC ("the Store") in Baltimore, Maryland. (Am. Compl., ECF No. 7.) The Store began participating in the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the food stamp program, in June 2013. (Administrative Appeal Record ("A.R.") 489.)

I. **The Supplemental Nutrition Assistance Program ("SNAP")**

SNAP is a government program operated by the Food and Nutrition Service ("FNS"), a component of the United States Department of Agriculture ("USDA"). *See* 7 C.F.R. § 271.3. The purpose of SNAP, which is operated pursuant to 7 U.S.C. §§ 2011-2036, is to provide food to low income individuals. *See* 7 U.S.C. § 2011. SNAP beneficiaries are awarded benefits in the form of an Electronic Benefits Transfer ("EBT") card, which is akin to a debit card and can be used only for the purchase of food and certain other eligible items sold by approved SNAP retailers. *See id.* §§ 2013(a), 2016(j); *see also* 7 C.F.R. § 271.2.

SNAP retailers are governed by certain regulations. *See* 7 C.F.R. § 278.6. Pursuant to those regulations, the FNS can permanently disqualify a SNAP retailer that it finds is "trafficking" in SNAP benefits. *Id.* "Trafficking" is defined in pertinent part as "buying, selling, stealing or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards … for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone." 7 C.F.R. § 271.2. A finding of trafficking must be based on evidence, which "may include facts established through on-site investigations, inconsistent redemption data, [and] evidence

obtained through a transaction report under an electronic benefit transfer system…." 7 C.F.R. § 278.6(a). If the FNS finds that a retailer has trafficked in SNAP benefits, the retailer is permanently disqualified from participation in SNAP. *Id.* § 278.6(e). FNS may impose a civil money penalty ("CMP") in lieu of permanent disqualification only where the retailer requests consideration of this alternative penalty within ten days, 7 C.F.R. § 278.6(b)(2)(iii), and where the retailer can meet certain other criteria designed to demonstrate that it had established and implemented an effective compliance policy and program to prevent SNAP violations. *See* 7 C.F.R. § 278.6(i).

The regulations provide for a system of administrative and judicial review of an FNS decision to disqualify a SNAP retailer. *See* 7 U.S.C. § 2023(a); 7 C.F.R. § 279. First, the FNS must send the retailer written notice of its initial decision. 7 U.S.C. § 2023(a)(1). Upon receipt of the written notice, the retailer may ask the FNS to review the initial decision. 7 C.F.R. § 279.1. If requested, the FNS must review the initial decision and render a Final Agency Decision. *Id.* § 279.5. After receiving notice of a Final Agency Decision, a retailer may seek judicial review in a state or federal court. *See* 7 U.S.C. § 2023(a)(13); 7 C.F.R. § 279.7.

## II. Facts of this Case

In this case, the FNS's electronic alert system[1] indicated that the Store's EBT data was consistent with possible trafficking in EBT benefits between January and June of 2018. (A.R. 488.) As a result, the FNS Retailer Operations Division ("ROD") began an

---

[1] The FNS's alert system, known as the "Anti-Fraud Locator Using Electronic Benefit Transfer (EBT) Retailer Transactions," is the system that FNS uses daily to analyze EBT data for patterns which may indicate fraudulent activity. (*See* A.R. 488.)

investigation into the Store. (A.R. 100-486, 488.) An individual from the ROD visited the Store on June 18, 2018. (A.R. 77-99, 490.) That visit revealed, *inter alia*, that: the Store had no shopping carts; the Store had only two baskets for shopping; the Store did not sell any meat bundles, seafood specials or fruit/vegetable boxes; and the Store did not carry any SNAP-eligible items over $5.00. (A.R. 490-97.)

The ROD also compared the Store's transactions to those of sixteen other SNAP-authorized stores in the area within a one-mile radius. (A.R. 505-509.) The ROD then analyzed all of the information gathered during its investigation and determined that the transactions discovered by the EBT data were, in fact, suspicious. (*Id.*) The Store's suspicious transactions fell into two categories: (1) repetitive transactions in a short period of time from the same household (A.R. 500, 519-21); and (2) excessively large purchase transactions (A.R. 505, 522-27). With respect to the repetitive transactions, there were 21 suspicious sets of transactions completed by 12 different households, where multiple purchase from individual benefit accounts occurred within a set time period. (A.R. 500.) With respect to the excessively large purchase transactions, the ROD found that the largest purchase amount at the Store during the review period was $74.50, and 312 out of the 2,235 transactions reviewed had amounts of $30.26 or more. (A.R. 503.) During the review period, the average convenience store transaction in Baltimore City, Maryland was $7.34, and the data revealed that the households making large transactions at the Store were not making similarly large transactions at any other store, regardless of store type. (A.R. 503-504.)

These transactions were inconsistent with the transactions at similarly situated SNAP retailers. (A.R. 505-515.) For example, the ROD compared the Store's transaction activity

4

to two similarly stocked stores in the area and found it to be atypical in comparison. (A.R. 507-509.) The Store had an average transaction amount that was at least $6.06 higher than the comparison stores, and $4.86 higher than the county average for a convenience store. (A.R. 509-511.) The Store's transaction history for dollar amounts of $30 to $69 was also significantly higher than the county average for convenience stores. (A.R. 512.) Finally, the ROD found that there were 31 households that conducted a transaction of $50 or more at a nearby large grocery store or supermarket within three days of also conducting a transaction of $50 or more at the Store during the review period. (A.R. 513.)

On August 29, 2018, the FNS sent a letter to Plaintiff Mohamed ("Charge Letter") informing him that the Store was being charged with trafficking under 7 C.F.R. § 271.2. (A.R. 516-518.) The Charge Letter detailed the suspicious transaction activity outlined above (A.R. 516-527) and stated that Mohamed had a right to explain the suspicious charges and a right—within ten days—to request a CMP ("Civil Money Penalty") in lieu of permanent disqualification (A.R. 517.) Mohamed did not respond to the Charge Letter within ten days, and, on September 12, 2018, the FNS issued its "Determination Letter," informing Mohamed of FNS's determination that the violations alleged in the Charge Letter occurred and of the imposition of a permanent disqualification for the trafficking violations. (A.R. 532-534.) The Determination Letter also stated that the Store was ineligible for a CMP because Mohamed had not submitted sufficient evidence to demonstrate that the Store had established and implemented an effective compliance program to prevent SNAP violations. (A.R. 533.)

Mohamed eventually responded to the Charge Letter, but that response was not received by the FNS until after it issued the Determination Letter. (A.R. 536-537, 923-924.) Accordingly, the FNS treated Mohamed's response as a request for an administrative review of the FNS's disqualification of the Store as a SNAP retailer. (A.R. 925.) In his response, Mohamed included invoices of goods sold by the Store and offered various explanations for the suspicious transactions, asserting: the transactions flagged for trafficking took place in the ordinary course of business; the Store sells milk products, formula, various produce, cereal, and frozen foods; the Store offers sale-promotions goods, making it unusual for the Store to have sales in small amounts; numerous customers purchased goods that were in sales promotions; the Store has consistent sales; and the alleged trafficking amount is immaterial to the Store's total cost of goods which shows no incentive for trafficking. (A.R. 536-537, 550-922.) Mohamed was also able to submit additional information to be considered on review, and submitted 13 statements from customers of the Store. (A.R. 925, 927-940.)

An Administrative Review Officer ("ARO") of the FNS reviewed the information submitted by Mohamed and then issued a Final Agency Decision on April 2, 2019. (A.R. 977-989.) The ARO found that the EBT transaction record provided substantial evidence that the questionable transactions during the review period had characteristics consistent with trafficking violations in SNAP benefits. (A.R. 978-986.) Specifically, the ARO found that multiple transactions made from individual benefit accounts in unusually short time frames "display[ed] characteristics of use inconsistent with the nature and extent of [the Store's] stock and facilities." (A.R. 982.) This finding was supported by 21 sets of

transactions, conducted by 12 different households, that totaled $2,123.39 in a 6-month period. (*Id.*) Considering the photographs from the Store visit, the ARO concluded that there was "no explanation as to why SNAP customers would routinely shop at [the Store] multiple times during a short period or purchase such large volume of items" when there was "no great variety of products, price advantage, profusion of large packages, or significant bulk items for sale." (*Id.*)

The ARO also found that 312 SNAP transactions as large as $74.50, totaling $14,349.55 over a 6-month period, were not supported by the Store's inventory, which does not have fresh meat or produce. (A.R. 982.) The Store visit revealed that there were no SNAP-eligible items offered for more than $5.00. (*Id.*) The ARO explained that, when comparing the Store's average SNAP transaction amount to that of two nearby similarly situated or better-stocked convenience stores, the Store's average was double than the other two stores, and the Store's average SNAP transactions were 40 percent greater than the average for all convenience stores in Baltimore City. (A.R. 983.) The ARO also considered invoices submitted by Mohamed, and found that the Store did have sufficient food purchases to justify its total monthly SNAP redemption. (A.R. 984.) The ARO concluded, however, that sufficient inventory alone does not explain the suspicious patterns of SNAP transactions such as the repetitive transactions by individuals during the same store visit or in a single day. (*Id.*) Finally, the ARO found that Mohamed never requested consideration for a trafficking CMP in lieu of a permanent disqualification nor did he provide any evidence that the Store had established and implemented an effective compliance policy to prevent SNAP violations. (A.R. 985.)

Consequently, the ARO upheld both the decision that "trafficking" had occurred and the decision to permanently disqualify the Store from the SNAP program. (A.R. 985-986.) Mohamed and the Store timely sought judicial review of the Final Agency Decision by filing a Complaint in this Court on May 13, 2019. (Compl., ECF No. 1.) On December 6, 2019, Plaintiffs filed an Amended Complaint. (Am. Compl., ECF No. 7.) Defendant filed the presently pending Motion to Dismiss the Amended Complaint or, in the Alternative, for Summary Judgment on September 11, 2020. (ECF No. 21.)

## STANDARD OF REVIEW

### I. Motion to Dismiss or, in the Alternative, for Summary Judgment

Defendant has filed a dispositive motion styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. Defendant has also attached exhibits to its submissions. (*See* Exhibit A, ECF No. 20-1; Exhibit B, ECF No. 20-2; Exhibit C, ECF Nos. 20-3, 24, 25, 26, 27, 28.) A court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). If the court does so, "the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Therefore, a motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider

it." *Sager v. Housing Com'n of Anne Arundel County*, 855 F. Supp. 2d 524, 542 (D. Md. 2012) (quoting 5C Wright & Miller, Fed. Prac. & Proc. § 1366, at 159 (3d ed. 2004, 2011 Supp.)). This Court chooses to consider Defendant's submissions and therefore treats its Motion as a motion for summary judgment.

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that may affect the outcome of the suit. *Anderson*, 477 U.S. at 248. In assessing a motion for summary judgment, the court must view the facts, and all inferences justifiably drawn therefrom, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The court must decide whether there is a genuine issue for trial, "not…weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249.

## II. Judicial Review of an FNS Decision to Disqualify a SNAP Retailer

As the United States Court of Appeals for the Fourth Circuit explained in *Negash v. United States*, "Congress has been quite firm in ensuring that [SNAP benefits] are used only to purchase eligible food items, and are not exchanged for cash or other things of value." 772 Fed. App'x 34, 35-36 (4th Cir. May 7, 2019) (quoting *Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004) (internal quotation marks omitted)).[2] "[A] store that is caught trafficking in food stamps even one time must be permanently disqualified from [SNAP], unless the Secretary of Agriculture determines that the store had in place an effective anti-trafficking

---

[2] While the Court is mindful that *Negash* is an unpublished opinion, and therefore non-binding, it accepts the Fourth Circuit's decision as persuasive authority.

policy." *Id.* "Trafficking is defined, as relevant here, as 'buying, selling, stealing or otherwise effecting an exchange of SNAP benefits issued and accessed via [EBT] cards … for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone.'" *Id.* (quoting 7 C.F.R. § 271.2 )(2018)). An aggrieved party "may seek judicial review of the USDA's finding that it trafficked in benefits." *Id.* (citing 7 U.S.C. § 2023(a)(13)).

Unlike most judicial review of agency action, the court is not bound by the administrative record, and the court's review of the USDA's trafficking determination is *de novo*. *Id.* (citing 7 U.S.C. § 2023(a)(15)); *see also, e.g.*, *Kim v. United States*, 121 F.3d 1269, 1272 (9th Cir. 1997); *Ibrahim v. United States*, 834 F.2d 52, 53-54 (2d Cir. 1987); *Modica v. United States*, 518 F.2d 374, 376 (5th Cir. 1975). The retailer has the burden of establishing by a preponderance of the evidence that the agency determination should be set aside. *AJS Petroleum, Inc. v. United States*, Civil Case No. L-11-1085, 2012 WL 683538, at *4 (D. Md. Mar. 1, 2012); *2341 E. Fayette St., Inc. v. United States*, No. Civ. JFM-05-974, 2005 WL 2373696, at *1 (D. Md. Sept. 26, 2005). If the court determines that no genuine issue of material fact is presented, it can resolve the issue by way of a motion for summary judgment. *See, e.g.*, *Idias v. United States*, 359 F.3d 695 (4th Cir. 2004); *Bon Supermarket & Deli v. United States*, 87 F. Supp. 2d 593, 599-600 (E.D. Va. 2000).

If the court concludes that a violation has occurred, it must then review the penalty issued by the FNS. *See Cross v. United States*, 512 F.2d 1212, 1215 (4th Cir. 1975) ("the scope of judicial review extends to the period of administrative sanction"). This review is to be conducted according to an "arbitrary and capricious" standard. *See, e.g.*, *Mahmood v. United*

*States*, 2012 WL 3038638, at *2 (D. Md. July 24, 2012); *2341 E. Fayette St., Inc.*, 2005 WL 237696, at *1. Thus, if the court finds that violations in fact occurred, the penalty issued by the FNS will be upheld unless the decision to impose that penalty was arbitrary or capricious.

## ANALYSIS

I.  **The Finding that Trafficking Occurred**

The FNS's determination that the Store engaged in trafficking is supported by the administrative record and Mohamed has failed to offer any credible argument to the contrary. The decision to hold a SNAP retailer liable for trafficking can be made even where the retailer is not caught red-handed exchanging SNAP benefits for cash or consideration other than eligible food. *See AJS Petroleum, Inc. v. United States*, Civil Case No. L-11-1085, 2012 WL 683538, at *5 (D. Md. Mar. 1, 2012). Indeed, the decision can be made based on "facts established through on-site investigations, inconsistent redemption data, and evidence established through a transaction report under an electronic benefits transfer system." *See* 7 U.S.C. § 2021(a)(2); 7 C.F.R. § 278.6(a).

In this case "a transaction report under an electronic benefits transfer system" indicated that the Store had engaged in suspicious transactions of two kinds: (1) repetitive transactions in a short period of time from the same household (A.R. 500, 519-21); and (2) excessively large purchase transactions (A.R. 505, 522-27). Based on this electronic alert, the FNS conducted an investigation into the Store, including an "on-site investigation" which revealed that the Store had no shopping carts; the Store had only two baskets for shopping; the Store did not sell any meat bundles, seafood specials or fruit/vegetable boxes; and the

11

Store did not carry any SNAP-eligible items over $5.00. (A.R. 490-97.) It also included a comparison of the Store's transactions to those of sixteen similarly situated stores—including two other convenience stores within a one-mile radius—which revealed that the SNAP activity at the Store was atypical, irregular, and inexplicable. (A.R. 503-515, 982.) For example, the largest purchase amount at the Store during the review period was $74.50, with 312 out of the 2,235 transactions reviewed had amounts of $30.26 or more. (A.R. 503.) In comparison, the average convenience store transaction in Baltimore City during the same period was $7.34. (*Id.*) This comparison revealed that the Store's transactions were very unusual and indicative of trafficking, considering that the Store's food stock consists primarily of inexpensive foods and grocery items, and that all of the SNAP-eligible items are priced under $5.00. (*Id.*)

Notwithstanding these undisputed facts, Plaintiffs argue that summary judgment is inappropriate in this case because they have not yet had the opportunity for discovery. (Pls.' Opp'n at 8-14, ECF No. 33-1.) Specifically, Plaintiffs seek, *inter alia*, data related to the computer programs and investigative reports relied upon by Defendant; household data for any and all participants listed in the Charging Letter; all transaction data for the comparator stores; and statistical and investigative case studies relied upon by Defendant in determining that Plaintiffs were trafficking in SNAP benefits. (*Id.*)

Contrary to Plaintiffs' assertion, they are not "entitled" to discovery in this case. Mohamed was provided the transaction data relied upon by the FNS and the FNS's explanation for its finding of permanent disqualification. (A.R. 516-527, 977-989.) Mohamed has also had the opportunity to provide evidence rebutting FNS's determination.

Mohamed's attempted explanations do not overcome the FNS's reasonable determination that the transaction activity was indicative of trafficking.

Nor does Mohamed explain how any further discovery would lead the Court to find otherwise. The types of discovery Plaintiffs seek would not create a genuine issue of material fact. While Plaintiffs contend that they are entitled to discover the identities of households whose EBT data was contained in the administrative record in addition to the identities of the comparison stores, Plaintiffs fail to articulate how these identities will create any dispute of material fact as to each of the numerous suspicious transfers that FNS identified. An Administrative Review Officer ("ARO") of the FNS found that multiple transactions made from individual benefit accounts in unusually short time frames "display[ed] characteristics of use inconsistent with the nature and extent of [the Store's] stock and facilities." (A.R. 982.) This finding was supported by 21 sets of transactions, conducted by 12 different households, that totaled $2,123.39 in a 6-month period. (*Id.*) Considering the photographs from the Store visit, the ARO concluded that there was "no explanation as to why SNAP customers would routinely shop at [the Store] multiple times during a short period or purchase such large volume of items" when there was "no great variety of products, price advantage, profusion of large packages, or significant bulk items for sale." (*Id.*) Plaintiffs simply do not explain how the identities of the households or the comparator stores would generate a factual dispute for this Court to deny summary judgment. Nor do Plaintiffs explain how statistical and investigative case studies relied upon by Defendant would create a dispute of material fact when all statutes and regulations governing the investigation and conduct at issue are publicly available.

Moreover, this Court has consistently granted pre-discovery judgment in favor of the United States in numerous SNAP cases and therefore, Plaintiffs' demand for discovery fails. *See Negash v. United States*, Civil No. RDB-17-1954, 2018 WL 3428716, at *4 (D. Md. July 16, 2018), *aff'd*, No. 18-1869, 2019 WL 2005678 (4th Cir. May 7, 2019); *7-Eleven, Inc. v. United States*, Civ. No. GLR-15-0543, 2016 WL 5107129, at *3-4 (D. Md. Jan. 29, 2016); *Mahmood v. United States*, Civ. No. WMN-12-0228, 2012 WL 3038638, at *1 n.4; *AJS Petroleum, Inc. v. United States*, Civ. No. L-11-1085, 2012 WL 683538, at *5 (D. Md. Mar. 1, 2012); *Bernal Deli Grocery v. United States*, Civ. No. MJG-10-1761 (D. Md. Aug. 26, 2011). Accordingly, absent any explanation to the contrary, the Court draws the only logical conclusion possible based on the evidence: from January to June of 2018, Mohamed and the Store were trafficking in EBT benefits.

## II. The Decision to Impose a Penalty of Permanent Disqualification

In light of its finding that the Store engaged in "trafficking," the FNS's decision to permanently disqualify the Store from SNAP was not "arbitrary and capricious." Permanent disqualification is almost always the appropriate sanction where a retailer is caught trafficking in SNAP benefits. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i). In fact, the FNS has discretion to impose a CMP instead of a penalty of permanent disqualification only where a retailer demonstrates that it had established and implemented an effective compliance policy and program to prevent SNAP violations. *See* 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(i). Moreover, according to 7 C.F.R. § 278.6(b)(2)(iii), "if a firm fails to request consideration for a civil money penalty in lieu of a permanent disqualification for

trafficking and submit documentation and evidence of its eligibility within the 10 days specified … the firm shall not be eligible for such a penalty."

Mohamed did not request a CMP nor has he provided any evidence that the Store had established and implemented an effective compliance policy to prevent SNAP violations. Accordingly, Mohamed would not be eligible for a CMP, a penalty the FNS would not have had the discretion to impose in any event. Accordingly, the FNS's decision to permanently disqualify the Store from SNAP was not "arbitrary and capricious." *See Idias v. United States*, 359 F.3d 695, 697 (4th Cir. 2004) ("A store that is caught trafficking in food stamps even one time must be permanently disqualified from the Food Stamp Program, unless [FNS] determines that the store had in place an effective anti-trafficking policy.").

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss the Amended Complaint or, in the Alternative, for Summary Judgment (ECF No. 21), treated as a motion for summary judgment, is GRANTED, and JUDGMENT IS ENTERED in favor of Defendant.

A separate Order follows.

Dated: February 12, 2021

                                                                      _____/s/_____
                                                                       Richard D. Bennett
                                                                       United States District Judge